UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                 :

J.W. and L.W., individually and on behalf of    :
Jake W., a minor,                               :
                                 :

                     Plaintiffs,  :
                                 :          13-CV-6905 (JPO)

              -v-                 :
                               :    <u>OPINION AND ORDER</u>

THE NEW YORK CITY DEPARTMENT OF     :
EDUCATION,                          :
                                 :

                    Defendant.  :
                                 :
-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Plaintiffs J.W. and L.W. (collectively, "the Parents") filed this action against the New

York City Department of Education ("the Department") pursuant to the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York

State Education Law, N.Y. Educ. Law § 4401 *et seq.*, seeking reversal of an administrative

decision of a State Review Officer denying private school tuition funding for their minor son,

Jake W. ("Jake").  Both parties now move for summary judgment.  For the reasons that follow,

the Court grants Defendant's motion and denies Plaintiffs' motion.

**I.**      **Background**

      **A.**      **Legal Framework**

      Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education" and "to ensure that the rights of children with

disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A), (B).  States

that provide a free appropriate public education ("FAPE") to all children who have disabilities

are eligible for federal funding under the IDEA.  *Id.* § 1412(a)(1)(A); *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).  A FAPE should "emphasize[ ] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

To receive federal funding, a state must provide each disabled child with an individualized education program ("IEP").  *See id.* § 1414(d)(1)(A).  The IEP, "the result of collaborations [among] parents, educators, and representatives of the school district," *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005) (internal quotation marks omitted), is a "written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"  *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining "IEP").  The IEP must comply with the procedures set forth in the IDEA and must be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982); *accord Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).  An IEP is not required, however, to "furnish every special service necessary to maximize each handicapped child's potential."  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (alterations and internal quotation marks omitted).

New York State receives federal funds under the IDEA, and is therefore obliged to comply with the Act's requirements.  *Walczak*, 142 F.3d at 123.  New York law charges local Committees on Special Education ("CSEs") with developing IEPs for disabled children.  N.Y.

Educ. Law § 4402(1)(b)(1); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2802 (2013). The CSE must include: the parents or guardians of the disabled child in question; the child's regular education teacher; the child's special education teacher; a school psychologist; and a district representative "qualified to provide or administer or supervise special education and . . . knowledgeable about the general curriculum and the availability of resources of the school district," among other individuals. N.Y. Educ. Law § 4402(1)(b)(1)(a). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Gagliardo*, 489 F.3d at 107-08 (internal citations omitted).

The IEP need not name a specific school placement for the child. *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009). The New York City Department of Education's practice "is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation . . . identifying a specific school at a later date. The parents are then able to visit the placement before deciding whether to accept it." *R.E.*, 694 F.3d at 191.

A parent who believes that his or her disabled child has been denied a FAPE under the IDEA may unilaterally place that child in a private school and then seek reimbursement from the school district. 20 U.S.C. § 1412(a)(10)(C)(ii); *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014); *see also Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) ("*Burlington*"); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993) ("*Carter*"). To determine whether a parent is entitled to reimbursement, a court applies the three-pronged *Burlington/Carter* test, "which looks to (1) whether the school district's proposed

plan will provide the child with a free appropriate public education; (2) whether the parents'
private placement is appropriate to the child's needs; and (3) a consideration of the equities."
*C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014).  The reimbursement
covers "expenses that [the school district] should have paid all along and would have borne in
the first instance had it developed a proper IEP."  *T.P. ex rel. S.P. v. Mamaroneck Union Free
Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (quoting *Burlington*, 471 U.S. at 370-
71) (internal quotation marks omitted).

 In order to receive reimbursement, the parent must file a due process complaint
challenging the appropriateness of the school district's recommendation.  A hearing on this
complaint is held before an impartial hearing officer ("IHO").  N.Y. Educ. Law § 4404(1).  The
IHO's decision may be appealed to a state review officer ("SRO"), *see* 20 U.S.C. § 1415(g);
N.Y. Educ. Law § 4404(2), and the decision of the SRO may be challenged in state or federal
court, 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).

 Here, Jake's parents rejected the Department's recommendation for the 2011-2012 school
year and unilaterally placed Jake in the Rebecca School, a private institution.  The Parents assert
that Jake was denied access to a FAPE in the 2011-2012 school year and demand that the
Department pay Jake's Rebecca School tuition for that year.  This case is before the Court after
conflicting decisions by the IHO and the SRO concerning whether the Department must
reimburse Jake's parents for that year's tuition.  The only issue pressed by the Parents in this
Court is whether the Department's proposed placement denied Jake a FAPE.

### B.    Factual Background

The following facts and procedural background are taken from the parties' submissions and the administrative record.[1]

#### 1.    IEP and Placement

Jake has autism.  He has significant developmental delays and sensory needs, and is primarily non-verbal.  (Dkt. No. 22 ("Pl. 56.1 Response") ¶ 2.)  There is no dispute that Jake is thus a "child with a disability," who is entitled to a FAPE under the IDEA.  *See* 20 U.S.C. § 1401(3)(A)(i).

Jake began attending the Rebecca School in July 2010, when he was six years old.[2]  (Pl. 56.1 Response ¶¶ 3-4.)  On May 24, 2011, after Jake had spent a year at the Rebecca School, the Department convened a CSE to create an IEP for Jake for the next school year.  (Pl. 56.1 Response ¶ 8; (Dkt. No. 20 ("Def. 56.1 Response") ¶ 2.)  The CSE, which included Jake's mother, developed an 18-page IEP that recommended that Jake be placed in a 12-month program, in a specialized school, and in a special class with a ratio of six students to one teacher and one classroom paraprofessional.  (Pl. 56.1 Response ¶¶ 9-11; IEP, Administrative Record Ex. G-B1.)  The IEP included various other recommendations, such as that Jake receive adaptive physical education, assistive technology, special education transportation, and occupational, physical, and speech-language therapy.  (Pl. 56.1 Response ¶ 16.)  The IEP did not specify a teaching methodology for Jake.

---

[1] The Administrative Record was filed with the Court under seal.  (Dkt. Nos. 8, 13.)

[2] The Court notes that the Rebecca School is a private school for children with autism and other neurodevelopmental delays located in Manhattan.  *See A.D. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2673 (RA), 2013 WL 1155570, at *2 (S.D.N.Y. Mar. 19, 2013).

Soon after the CSE meeting, on June 8, 2011, the Department issued a "Final Notice of Recommendation," which offered Jake a placement at public school P373R@P058R ("the Public School").  (*Id.* ¶ 20; Final Notice of Recommendation, Administrative Record Ex. H-4.)  In a letter dated June 27, 2011, Jake's mother informed the Department that she did not find the placement appropriate.  She stated that she had toured the Public School on June 21, 2011 with a woman she believed to be a parent coordinator, and had determined that Jake "has not made progress in a similar program."  She wrote that she intended to enroll Jake in the Rebecca School for the 2011-2012 school year and seek reimbursement for the tuition.  (Pl. 56.1 Response ¶¶ 21-22; Parent Correspondence to CSE, Administrative Record Ex. G-E1.)  Jake attended the Rebecca School for the 2011-2012 school year, and the tuition for that year was $94,750.  (Pl. 56.1 Response ¶ 23; Def. 56.1 Response ¶ 3.)

On October 5, 2011, the Parents filed a due process complaint requesting an administrative hearing and seeking prospective payment of Jake's tuition at the Rebecca School for the 2011-2012 school year.  (Pl. 56.1 Response ¶ 30; Def. 56.1 Response ¶ 4.)  The due process complaint alleged various substantive and procedural errors with Jake's IEP and substantive issues with his placement, including an allegation that the placement was not appropriate because Jake "did not make progress in a similar program."  (Pl. 56.1 Response ¶¶ 31-32; Impartial Hearing Request, Administrative Record Ex. G-A3.)  Jake's mother later testified that, by this, she meant that the Public School employed the Applied Behavior Analysis, or "ABA" methodology, to which Jake had not responded in the past.  (Def. 56.1 Response ¶ 16; Transcript, Administrative Record Ex. F, at 504-07.)  The Rebecca School uses a different methodology called the "Developmental Individual-difference Relationship-based Model," also

known as the "DIR" or "Floortime" methodology.  (Pl. 56.1 Response ¶ 26; Transcript at 310, 362.)

### 2.    Hearings

An impartial hearing was convened over five non-consecutive days between January 3 and February 27, 2012.  (Pl. 56.1 Response ¶ 34; Def. 56.1 Response ¶ 5.)  Jake's mother testified on his behalf, as did Christine Kiefer, an occupational therapist who had worked with Jake in the past, and five witnesses from the Rebecca School.  (Pl. 56.1 Response ¶ 35.)  The Department psychiatrist who had been a member of Jake's CSE and Christine Hoffman, a teacher at the Public School, testified for the Department.  (*Id.* ¶ 36.)

As relevant here, the impartial hearing witnesses testified to the difference between the ABA and DIR methodologies.  Christine Kiefer testified that she has received training in both ABA and DIR, and that she had used both methodologies in one-on-one sessions with Jake.  She testified that her use of ABA with Jake involved a "task-oriented approach," using "one object at a time," with "rewards" and "positive reinforcements."  She said that Jake "was not responding well to [ABA] and he was regressing more than progressing."  She "felt that ABA was not something [Jake] was able to tolerate," and that "his responses were regressive from the ABA." After five months of using ABA with Jake, Kiefer switched to DIR.  (Transcript at 188-191, 214.)  She used DIR with Jake for 10 months.  (*Id.* at 214.)  She testified that DIR involves "Floortime play, which is less structured [than ABA]."  (*Id.* at 192-93.)

According to Kiefer, after the switch to DIR, Jake "became much calmer," "[h]is eye contact improved," "[h]is tolerance to working with a toy or a task where it was a little more challenging had increased," and "[h]e would not shut down like he did with the ABA method." (*Id.* at 191.)  Kiefer concluded that Jake "responds better as far as learning, communication,

socialization, . . . activities of daily living, . . . and his . . . learning . . . with the DIR method";
while Jake was progressing with DIR, he was "unresponsive" and "regressing" with ABA.  (*Id.*
at 196.)  The Program Director at the Rebecca School agreed with Kiefer; she testified that DIR
is an appropriate methodology for Jake and that "ABA would not work for Jake."  (*Id.* at 255-57,
260-62.)

 Jake's mother also testified.  She reported that she had visited the Public School after the
Department informed her that it was the proposed placement for Jake.  While at the school, she
said, she "asked the woman who gave—who was giving me the tour . . . and she said we do teach
ABA."  (*Id.* at 520-21.)  Jake's mother testified that she concluded, after hearing this, that the
Public School was not appropriate for Jake because it used ABA, but did not voice these
concerns to the person who was giving her the tour of the school.  (*Id.* at 521.)  She decided to
enroll Jake in the Rebecca School instead.

 Christine Hoffman testified that she would have been Jake's teacher had he come to the
Public School.  (*Id.* at 123-24.)  When asked what methodology she uses in the classroom,
Hoffman testified that she uses the ABA methodology (*id.* at 155-57), but that her teaching is
"individualized," that it is "specific for each child," and that she "handle[s] each child according
to their individual needs" (*id.* at 126-27, 153).

 On April 13, 2012, the IHO issued a decision rejecting the Parents' allegations of
procedural error, but holding for the Parents on substantive grounds.  Specifically, the IHO found
that the proposed placement was not appropriate for Jake because it "included ABA teaching
methodology which was not appropriate because it would not enable J[ake] to make educational
progress."  (IHO Decision, Administrative Record Ex. C, at 12.)  She further found that the
Parents' unilateral placement of Jake at the Rebecca School was appropriate, and that the

equities favored the Parents because Jake's mother had "fully cooperated with the [Department]." (*Id.* at 13.)  Accordingly, the IHO granted the Parents' request for reimbursement of the Rebecca School tuition but reduced the amount by ten percent to reflect that the Rebecca School is in session until only 12:30 on Fridays. (*Id.* at 13-14.)

Both parties appealed the IHO's decision.  In a petition dated May 18, 2012, the Department contended that Jake had been offered a FAPE at the Public School; that the parents had failed to show that the Rebecca School was appropriate; and that the equities did not favor the parents.  The Parents cross-appealed on the issue of whether the Rebecca School tuition was properly reduced due to the shortened Friday school days.  (Pl. 56.1 Response ¶¶ 56-57; Def. 56.1 Response ¶ 7.)  The SRO reversed the IHO's decision.  He held that the IEP was reasonably calculated to enable Jake to receive a FAPE.  (SRO Decision, Administrative Record Ex. B, at 16.)  As for the placement at the Public School, he held that the IHO should not have addressed the issue of teaching methodology, as the Parents had waived this issue by not raising it in the due process complaint.  (*Id.* at 10-11.)  Nevertheless, he addressed this issue on the merits and concluded that, at the time the Parents rejected the proposed placement, the concerns that the Parents had with the Public School's methodology were speculative.  (*Id.* at 16-17.)  He further found that the evidence introduced at the impartial hearing "does not support the conclusion that ABA would have been the sole methodology utilized in the classroom, or that the use of ABA in the classroom would have denied the student a FAPE." (*Id.* at 18.)

On September 30, 2013, the Parents filed a complaint in this Court.  (Dkt. No. 1.)  The complaint challenges the decision of the SRO and alleges violations of the IDEA and the New York State Education Law.  (*Id.*)  Both parties now move for summary judgment on all claims. (Dkt. Nos. 14, 17.)

## II.    Legal Standard

"IDEA actions generally are resolved on summary judgment."  *S.H. v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 1041 (PKC), 2011 WL 666098, *2 (S.D.N.Y. Feb. 15, 2011).  Summary judgment in the IDEA context, however, is unique.  "[T]he procedure is in substance an appeal from an administrative determination, not a summary judgment motion."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (internal quotation marks and brackets omitted).  It "involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions."  *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)) (internal quotation marks omitted).  The inquiry is directed at "whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."  *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 498 n.1 (S.D.N.Y. 2013) (internal quotation marks omitted).

Specifically, under the IDEA, "a district court must conduct an independent review of the administrative record, along with any additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions have been met."  *Id.* at 498 (citing *Grim*, 346 F.3d at 380-81); *see also* 20 U.S.C. § 1415(i)(2)(C) (stating that a federal court reviewing administrative proceedings under the IDEA "shall receive the records of the administrative proceedings," "shall hear additional evidence at the request of a party," and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate").

This independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."

*Rowley*, 458 U.S. at 206.  Rather, the review is "circumscribed"; a district court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *A.C. ex rel. M.C.*, 553 F.3d at 171 (internal quotation marks and brackets omitted); *see also C.F. ex rel. R.F.*, 746 F.3d at 77 ("The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." (quoting *Gagliardo*, 489 F.3d at 112-13) (internal quotation marks omitted)).  This standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review."  *M.H.*, 685 F.3d at 244 (internal quotation marks and alterations omitted).

When, as here, "the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision, as the 'final decision of the state authorities.'"  *F.B. v. N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 578 (S.D.N.Y. 2013) (quoting *R.E.*, 694 F.3d at 189).  This is particularly true "when the state officer's review has been thorough and careful."  *Id.* (quoting *R.E.*, 694 F.3d at 184).  However, where the district court "appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges."  *Id.* (quoting *R.E.*, 694 F.3d at 189) (internal quotation

marks omitted).  Further, "courts should defer to the IHO's analysis when considering an issue

not reached by the SRO." *C.F. ex rel. R.F.*, 746 F.3d at 77 (citing *M.H.*, 685 F.3d at 252).[3]

The Second Circuit has recently provided guidance as to which administrative

determinations are due most deference.  "[D]eterminations regarding the substantive adequacy of

an IEP should be afforded more weight than determinations concerning whether the IEP was

developed according to the proper procedures." *M.H.*, 685 F.3d at 244 (citing *Cerra*, 427 F.3d at

195).  "Decisions involving a dispute over an appropriate educational methodology should be

afforded more deference than determinations concerning whether there have been objective

indications of progress." *Id.*  Determinations that are "grounded in thorough and logical

reasoning" merit more deference than those that are not. *Id.*  Finally, "the district court should

afford more deference when its review is based entirely on the same evidence as that before the

SRO"—the case here—"than when the district court has before it additional evidence that was

not considered by the state agency." *Id.*

In sum, "judicial review of administrative decisions under the IDEA requires the court

(1) to conduct an independent review of the administrative record, (2) use a preponderance of the

evidence standard, and (3) give deference to the administrative determinations, particularly that

---

[3] Plaintiffs argue that the SRO "is not entitled to deference" here because the SRO failed to
comply with statutory deadlines in rendering his decision.  (Dkt. No. 15 ("Pl. Br.") at 8-9.)
Plaintiffs are correct that the SRO issued his decision over a year past the statutory deadline.
"However, no authority permits courts to give less respect to SRO decisions on the basis of
delay, nor is there any logical reason to do so." *P.S. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 4772
(LGS), 2014 WL 3673603, at *7 n.3 (S.D.N.Y. July 24, 2014); *accord M.L. v. N.Y.C. Dep't of
Educ.*, 13 Civ. 574 (ALC) (JLC), 2014 WL 1301957, at *13 (S.D.N.Y. Mar. 31, 2014)
("Although the Court agrees with Plaintiffs that the State Review Office's routine delays in
issuing decisions is problematic, it has found no authority in IDEA cases that allows it to declare
the SRO's decision a nullity." (internal quotation marks omitted)).

of the SRO." *F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 5131 (RKE), 2012 WL

4891748, at *5 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 553 F. App'x 2 (2d Cir. 2014) (summary order).[4]

## III.   Discussion

Unlike in many other IDEA cases brought against the Department, Jake's parents do not

challenge the adequacy of the IEP.  Rather, they object only to the Department's proposed

placement.  Specifically, they contend that the placement would not have been able to provide

Jake a FAPE because, due to its use of ABA methodology, it was not capable of implementing

the long- and short-term goals outlined in Jake's IEP.  (*See* Dkt. No. 21 ("Pl. Opp.") at 5 (noting

that "[a]n IEP by design is only a document and it must be implemented in a classroom to

provide a special needs children with a FAPE," and that, here, this did not occur "because of the

use of ABA"); *id.* at 8 ("Here the proposed school could not implement the IEP . . . .").)  The

Department asserts, first, that this argument is waived and, second, that the Parents' concern that

the Public School would use ABA with Jake is retrospective and speculative.  (Dkt. No. 18

("Def. Br.") at 1.)

### A.   Waiver

As explained above, a party must file a due process complaint in order to allege

deficiencies in an IEP.  20 U.S.C. § 1415(b)(7)(A).  After this complaint is filed, the Department

has 30 days to remedy any deficiencies.  *Id.* § 1415(f)(1)(B)(ii).  Because "[t]he Department

cannot be expected to resolve problems of which it is unaware," "the parents must state all of the

---

[4] One court in this district has noted that the standard of review on an appeal in an IDEA case is
"somewhat Janus-like," as, "[o]n the one hand, the IDEA requires this Court to conduct an
independent review of the administrative record and make a determination based on a
preponderance of the evidence," and, "[o]n the other hand," not "to substitute [the Court's] own
notions of sound educational policy for those of the school authorities which they review."  *B.R.
ex rel. K.O. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 675 (S.D.N.Y. 2012) (internal
quotation marks and alterations omitted).

alleged deficiencies in the IEP in their initial due process complaint in order for the resolution period to function." *C.F. ex rel. R.F.*, 746 F.3d at 77-78 (internal quotation marks and brackets omitted). The IDEA further provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [due process complaint], unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). Accordingly, courts in this district have held that they will not review issues that were not raised in a due process complaint, absent agreement from the opposing party. *See C.F. ex rel. R.F.*, 746 F.3d at 78 (collecting cases).

The Department argues that the Parents waived their objection to the methodology used at the Public School by not raising it in their due process complaint. (Def. Br. at 12-15.) The Parents respond that the complaint's statement that Jake "has not made progress in a similar program" referred to the Public School's use of ABA, and that this statement provided the Department with sufficient notice that teaching methodology was at issue. (Pl. Opp. at 3-4.) The SRO agreed with the Department, and held that the IHO should not have addressed the Parents' objection to the Public School's teaching methodology. This Court does not defer to the SRO's holding, however, as "[d]eterminations about whether arguments are preserved for SRO or district court review are . . . well within the institutional competence of the courts." *N.S. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 7819 (VEC), 2014 WL 2722967, at *6 (S.D.N.Y. June 16, 2014) (citing *M.H.*, 685 F.3d at 250-51).

Moreover, since the SRO's decision, the Second Circuit has clarified that the waiver rule "is not to be mechanically applied" in IDEA cases. *C.F. ex rel. R.F.*, 746 F.3d at 78. In fact, "the IDEA itself contemplates some flexibility," as it "does not require that alleged deficiencies be detailed in any formulaic manner." *Id.* (citing 20 U.S.C. § 1415(b)(7)(A)(ii)). In *C.F. ex rel.*

*R.F.*, the Second Circuit applied flexible waiver principles to hold that the plaintiffs had not waived an objection that the Department had failed to consider a specific staffing ratio where there was no mention of staffing ratios in the due process complaint.  746 F.3d at 74 n.4, 78.  The court based its decisions on four factors.  First, both the IHO and the SRO had reached the staffing ratio issue on the merits, "giving [the court] a record for review."  *Id.* at 78.  Second, the staffing ratio issue went to "the heart of this dispute."  *Id.*  Third, the complaint included a general allegation that the Department had failed to develop appropriate plans for the child's behaviors, providing "fair notice" to the Department of the argument at issue.  Finally, the parents had proposed in the complaint that their disabled child remain at his current, private school, where, as the Department was aware, the child received the staffing ratio that the parents preferred.  *Id.*

These considerations merit the same result here.  The IHO and the SRO reached the issue of teaching methodology, giving this Court a record for review.  And the due process complaint's statement that Jake had "not made progress in a similar program" gave the Department adequate notice that the type of program recommended by the Department— including the methodology of that program—was at issue.  Finally, because the Department cross-examined the Parents' witnesses extensively on the issue of methodology, it "cannot genuinely claim that it was prejudiced by the IHO's consideration of such evidence."  *Y.S. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2590 (WHP), 2013 WL 5722793, at *6 (S.D.N.Y. Sept. 24, 2013) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 150 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012)) (internal quotation marks omitted).  For these reasons, federal court review of the issue of methodology is not foreclosed.

### B.     Appropriateness of the Placement

"The case law regarding challenges to a school's ability to provide a FAPE is less than a model of clarity." *N.S.*, 2014 WL 2722967, at *12.  However, several points are clear.  First, a school district is not required to designate a specific school in an IEP.  *T.Y.*, 584 F.3d at 420. Second, and despite this, "school districts are not permitted to assign a child to a school that cannot satisfy the IEP's requirements." *N.S.*, 2014 WL 2722967, at *12; *see also T.Y.*, 584 F.3d at 420 ("We emphasize that we are not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements."); *V.S. ex rel. D.S. v. N.Y.C. Dep't of Educ.*, 25 F. Supp. 3d 295, 299 (E.D.N.Y. 2014) ("[T]he school must be capable of implementing the IEP.").  Third, where parents do not object to the IEP and have not enrolled their child in the proposed placement, the burden is on the parents "to establish that the school district would not have adhered to the written plan." *N.S.*, 2014 WL 2722967, at *2 (citing cases).[5]  Such a burden is difficult to meet:  "[t]here should be few circumstances . . . in which parents can, if there is an adequate IEP, successfully challenge a placement if their child never attended the school." *Id.* at *12.[6]

In determining whether it is faced with one of these "few circumstances," a court may consider only the information that was available to the parents at the time that they rejected the

---

[5] The burden rests on the Parents for another reason: namely, because the SRO concluded that the Public School placement was appropriate, "and the courts are bound to exhibit deference to that decision." *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (internal quotation marks omitted).

[6] The Court rejects the Department's suggestion that parents can *never* object to a recommended school where the parents choose not to enroll their child at that school.  (Def. Br. at 16.)  The Department cites the Second Circuit's decision in *R.E.*, 694 F.3d 167, for this proposition. Courts in this district, however, have not interpreted *R.E.* so broadly, and the Court agrees. *See, e.g., J.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2184 (KBF), 2013 WL 1803983, at *2 (S.D.N.Y. Apr. 24, 2013) ("While it is possible to read *R.E.*'s holding broadly enough to exclude all prospective challenges to a student's classroom placement, the Court declines to do so absent more explicit instruction from the Second Circuit.").

recommended placement.  Retrospective evidence discovered after this decision was made should not be considered.  *See Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 445 (S.D.N.Y. 2014) ("The proper inquiry for the Court . . . is whether the alleged defects of the placement were reasonably apparent to Plaintiff or the [Department] when Plaintiff rejected [the placement]."); *D.C. ex rel. E.B.*, 950 F. Supp. 2d at 513 ("[I]n cases such as this case, involving implementation of the IEP, testimony from the Department is permissible, but it must be limited to information that was reasonably known to the parties at the time of the placement decision."); *see also R.E.*, 694 F.3d at 186 (holding that the evaluation of an IEP must be made "prospectively as of the time of its drafting," and that "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered").  In addition, a court must be satisfied that this non-retrospective evidence was sufficient to support the parents' decision to reject the proposed placement.  That is, the decision must be supported by facts; it cannot be merely speculative.  "Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195.

There are very few cases in this district in which parents have successfully challenged a proposed placement on the ground that it is incapable of implementing their child's IEP where the child never enrolled in the placement.  In these cases, the conflict between the IEP and the placement was clear to the parents when they rejected the placement.  For example, in *D.C. ex rel. E.B.*, 950 F. Supp. 2d 499, the court was faced with a child who had severe allergies to seafood.  The IEP promised a "seafood free environment"; however, when the child's mother visited the cafeteria at the proposed placement, she was informed that it was not seafood-free and that seafood was prepared in various areas at the school.  Accordingly, the court held that the

proposed placement was inappropriate under the IDEA.  *Id.* at 509-11.  And in *B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670 (S.D.N.Y. 2012), the IEP for an autistic child specified that the child required 1:1 occupational therapy.  When the child's mother visited the proposed placement, the occupational therapist on staff informed her that therapy was performed with one therapist and *six* students.  Based on this information, the mother rejected the placement.  *Id.* at 676-77.  The court held that the parent was entitled to reimbursement because the proposed placement failed to conform to the IEP, and therefore failed to provide the child a FAPE.

Unlike the parents in *D.C. ex rel. E.B.* and *B.R. ex rel. K.O.*, the Parents in this case have not identified a specific requirement in the IEP that the placement will not satisfy.  Nor can they do so, as Jake's IEP does not specify a teaching methodology.  Instead, the Parents suggest that, as a general matter, the Public School will fail to implement the IEP because the school employs a methodology to which Jake is unresponsive, and with which he will regress.  It is unclear whether an objection like this, which does not correlate directly to a requirement in the IEP, is tenable.  The Second Circuit has not spoken to the issue, and the Court need not decide it now.[7] Instead, the Court assumes without deciding that the implementation of ABA methodology is inconsistent with the success of Jake's IEP.  Even with this assumption, the Parents' objection

---

[7] In *J.F.*, the court suggested that the IDEA statutory scheme *requires* courts to allow parents to object to aspects of the placement that are problematic and yet "beyond the four corners of the IEP," at least to the extent that those aspects of the placement violate specific provisions of New York IDEA law.  2013 WL 1803983, at *2-3.  The Parents' objection in this case does not fall into this category.  To the contrary, courts in this district have held that parents do not have a right under the IDEA to a specific teaching methodology, *see F.L. ex rel. F.L.*, 2012 WL 4891748, at *9; *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3733 (KBF), 2012 WL 4017822, at *12 (S.D.N.Y. Aug. 23, 2012), *aff'd*, 530 F. App'x 81 (2d Cir. 2013) (summary order), and there is no provision in New York law requiring that students receive the teaching methodology of their choice.

fails, as they have not identified sufficient non-retrospective, non-speculative evidence that Jake

would in fact have been taught with the ABA method at the Public School.

The Parents' objection to the Public School is, by their own admission, predicated almost

entirely on the assumption that Jake would have been placed in Christine Hoffman's classroom,

and that Hoffman would have used ABA with Jake.  (Pl. Opp. at 1 ("The critical issue in this

case is whether Ms. Hoffman would have used [ABA] with Jake.").)  There is no evidence,

however, that the Parents knew when they rejected the placement that Jake would have been in

Hoffman's class.  They cite only Hoffman's testimony at the impartial hearing.  (*Id.* at 1-3; Dkt.

No. 15 ("Pl. Br.") at 13.)  Hoffman's testimony, however, is retrospective, and therefore the

Court cannot consider it.  *See N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 588-89

(S.D.N.Y. 2013) ("A court may not consider evidence that . . . 'a child would have had a specific

teacher or specific aide' . . . [because] 'at the time the parents must decide whether to make a

unilateral placement based on an IEP, they may have no guarantee of any particular' classroom."

(quoting *R.E.*, 694 F.3d at 187)) (internal brackets omitted); *R.B. v. N.Y.C. Dep't of Educ.*, No.

12 Civ. 3763 (AJN), 2013 WL 5438605, at *11 (S.D.N.Y. Sept. 27, 2013) ("Pursuant to Second

Circuit precedent, courts are prohibited from evaluating the adequacy of an unimplemented IEP

based on evidence about the particular classroom in which a student would be placed." (internal

quotation marks omitted)), *aff'd*, 589 F. App'x 572 (2d Cir. 2014) (summary order).[8]

The only non-retrospective evidence that the Parents cite to support their contention that

Jake would have been taught with ABA at the Public School is that when Jake's mother visited

---

[8] For this reason, both the IHO and the SRO erred in considering Hoffman's testimony.  *See Reyes*, 760 F.3d at 222 ("[T]o the extent that the SRO relied on retrospective testimony to dismiss Reyes's concerns about the TEACCH methodology, such reliance was inappropriate." (citing *R.E.*, 694 F.3d at 185-87) (footnote omitted)).  The Court therefore does not give deference to this aspect of the SRO's decision.

the school in June 2011, she was told by a woman at the school that the school uses ABA.  (Pl. Opp. at 9 ("[T]he parent was told during her visit that the school used ABA.").)  This evidence is insufficient, however, to support the Parents' conclusion that the Public School would have used ABA, and ABA exclusively, with Jake.  First, Jake's mother admitted at the impartial hearing that she was uncertain of the position and knowledge of the woman who told her the Public School uses ABA.  She did not remember the woman's name,[9] and when asked the woman's title, she stated, "I don't—parent coordinator maybe.  I'm not sure."  (Transcript at 520.)  There is no evidence on the record as to what a "parent coordinator" is and the level of knowledge such a coordinator would have about the various methodologies used at the Public School.  In fact, Jake's mother testified that she "kn[e]w [the coordinator] wasn't a teacher because I asked her. And she said no she's not a teacher.  So I don't know if she would have known [answers to] questions about ABA.  She wasn't certified or in special ed[ucation] or anything like that.  She told me she was never in the classroom, so I don't know."  (*Id.* at 522.)  Finally, and most important, there is no evidence on the record that the woman specified that ABA was the *only* methodology used at the school, that it was used with every student, or that specific accommodations could not be made for Jake.  In fact, Jake's mother acknowledged at the impartial hearing that she "did not ask" the parent coordinator "how they would have been able to accommodate [her], if at all, if [she] had concerns with ABA."  (*Id.* at 521-22.)  For these reasons, the Court defers to the SRO's determination that the Parents' objection to the proposed placement was speculative.  *See F.L. ex rel. F.L.*, 2012 WL 4891748, at *14 (upholding the SRO's determination that a placement was not inadequate where "[t]he only support plaintiffs

---

[9] In a letter to the Department written immediately after she toured the school, Jake's mother identified the woman as Maria Cacase.  (Pl. 56.1 Response ¶ 21.)

offer[ed] to demonstrate [the alleged inadequacy] [was] testimony from [the child]'s mother based on her single hour-and-a-half visit to [the school]"); *cf. N.K.*, 961 F. Supp. 2d at 592 (holding that "[t]he fact that Plaintiffs did not observe any sensory equipment on their site visit is insufficient to demonstrate that [the school] lacked such equipment or that the school would not obtain the equipment necessary to implement [the child's] IEP should [the child] attend the school.").[10]  The Parents' action in rejecting the Rebecca School without engaging in a conversation with the Public School about how the school would attempt to meet Jake's needs "suggest that they seek a 'veto' over school choice, rather than 'input'—a power the IDEA clearly does not grant them." *T.Y.*, 584 F.3d at 420.

Because the Court holds for the Department on the first *Burlington/Carter* issue, it need not reach the final two issues, namely (1) whether Jake's placement at the Rebecca School was appropriate, and (2) whether equitable considerations affect relief.

## IV.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiffs' motion for summary judgment is DENIED.  The Clerk of Court is directed to close the motions at Docket Numbers 14 and 17 and to close the case.

Dated: March 27, 2015
        New York, New York

J. PAUL OETKEN
United States District Judge

---

[10] The Parents have also failed to identify any evidence that, when they rejected the proposed placement, it was reasonably apparent to *the Department* that the placement would be unable to implement the IEP.  *See Scott*, 6 F. Supp. 3d at 445 (stating that "[t]he proper inquiry for the Court . . . is whether the alleged defects of the placement were reasonably apparent to Plaintiff *or the* [*Department*] when Plaintiff rejected [the placement]" (emphasis added)).